```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA,

     - against -                         MEMORANDUM & ORDER

OMARI SCOTT,                             24-CR-158 (KAM)

          Defendant.
------------------------------------X
```

**KIYO A. MATSUMOTO, United States District Judge:**

Defendant Omari Scott ("Defendant" or "Scott") is charged with promotion of prostitution in violation of 18 U.S.C. § 1952 ("Count One"), sex trafficking of Jane Doe 1 in violation of 18 U.S.C. § 1591(a)(1) ("Count Two"), sex trafficking of Jane Doe 2 in violation of 18 U.S.C. § 1591(a)(1) ("Count Three"), and murder in the course of sex trafficking in violation of 18 U.S.C. § 2245 ("Count Four").  (*See* ECF No. 1, "Indictment.")  Scott has moved to dismiss Count Four of the Indictment on the grounds that § 2245 encompasses only the murders of victims of sexual assault, sex trafficking, or exploitation.  (*See* ECF No. 44-1, Defendant's Motion to Dismiss Count Four, "Mot. to Dismiss.")  Scott has also moved to suppress the fruits of an electronic surveillance Order issued on October 25, 2022.  (*See* ECF No. 48-1, Defendant's Motion to Suppress, "Mot. to Suppress.")  For the reasons below, Scott's motion to dismiss and motion to suppress are respectfully denied.

## BACKGROUND

### I. Factual Background

#### A. The Charges

According to the government, between approximately January 2021 and June 2023, Omari Scott engaged in the sex trafficking of at least two women, Jane Does 1 and 2, along a stretch of Pennsylvania Avenue in Brooklyn, New York (the "Penn Track"). (ECF No. 50, "Opp." at 7.)  The government claims that Scott would use Jane Does 1 and 2, through force, fraud, and coercion, to solicit customers on the Penn Track and other locations, and to engage in commercial sex acts with those customers in cars or in nearby hotels.  (*Id.*)  The government further asserts that Scott would collect the proceeds earned by the women he trafficked, and would use violence and threats of violence against them if these women did not continue to earn money for him.  (*Id.*)

The government claims that, in late April 2023, Scott learned that Jane Doe 2 was planning on leaving him to work for the murder victim, Cleveland Clay ("Clay"), who also had women working for him in prostitution on the Penn Track.  (*Id.* at 9.)  On May 1, 2023, Scott was captured on video engaged in a heated argument with Clay along the Penn Track.  (*Id.*)  The government further asserts that the dispute between Scott and Clay ultimately culminated in Scott and co-defendant Michael Simmons ("Simmons") deciding to murder Clay, which Simmons carried out on Scott's

behalf by shooting and killing Clay shortly after 8:00 a.m. on May 1, 2023.  (*Id.*)

### B. The Welch Wire

Beginning in October 2022, the government sought three wiretap orders pursuant to 18 U.S.C. ch. 119 (also referred to as "Title III"), which all sought authorization to intercept wire and/or electronic communications on a cellphone number used by Scott's associate, Douglas Welch (the "Welch Phone").  (Opp. at 20.)  The wiretap applications were each supported by a single affidavit from Special Agent Brian Gander of the Federal Bureau of Investigation.  (ECF No. 48-3, the "Gander Affidavit" or "Gander Aff.")  The Gander Affidavit explained that probable cause existed based on, *inter alia*, (1) recorded calls between Welch and several of his associates in which Welch discussed the trafficking of certain women in prostitution on the Penn Track, as well as the use of violence against these women, including punching a victim in the mouth, breaking her teeth, and knocking out a different victim on the sidewalk; (2) recorded calls between other individuals in which the participants discussed Welch and other individuals' trafficking women in prostitution on the Penn Track; (3) messages between Welch and other individuals on cell phones searched pursuant to judicially-authorized search warrants in which Welch discussed trafficking women in prostitution and traveling to Las Vegas to have women work in prostitution for him

3

there; (4) messages between Welch and other individuals on social media accounts searched pursuant to judicially-authorized search warrants in which Welch discussed trafficking women in prostitution; (5) witness statements; (6) surveillance of Welch and other individuals on the Penn Track on numerous dates; and (7) toll records reflecting that Welch regularly spoke with victims of sex trafficking and other individuals known to traffic women on the Welch Phone. (Gander Aff. ¶¶ 24-25, 28-34, 36-39.) The Gander Affidavit explained why wire interceptions were necessary due to the use of certain alternative investigative techniques without success. (*Id.* ¶¶ 49-53.)

The Gander Affidavit mentions Scott by name and describes evidence of Scott's involvement in sex trafficking and promoting prostitution on the Penn Track. (*Id.* ¶¶ 11, 26, 34.) That evidence included recorded calls made in 2021 between Scott and an incarcerated individual in which Scott (1) agreed to keep tabs on women working for that individual in prostitution on the Penn Track; (2) described "train[ing]" women working for him in prostitution by taking "all of their shit and keep[ing] it in [his] cars and lock[ing] her out of the hotel until she gets more rooms," (3) discussed a minor working for Scott in prostitution, and (4) discussed numerous other individuals who were engaged in trafficking women in prostitution on the Penn Track as well as violent incidents on the Penn Track. (*Id.* ¶ 26.)

4

On or about October 25, 2022, the Honorable Lorna G. Schofield, United States District Judge for the Southern District of New York, authorized the Welch Wire for a period of 30 days (the "October 25 Order"). (Opp. at 8 n.1.) The October 25 Order specifically identified Scott as one of eight "target interceptees." (ECF No. 49-4 ¶ 1.) The interception was reauthorized on November 23, 2022 (the "November 23 Order"), by the Honorable Victor Marrero, United States District Judge for the Southern District of New York, for a second 30-day period. (Opp. at 8 n.1.) Then, on December 22, 2022, the Honorable John P. Cronan, United States District Judge for the Southern District of New York, reauthorized the interception for a third 30-day period (the "December 22 Order"). (*Id.*) Interception pursuant to the December 22 Order ended on January 21, 2023. (*Id.*)

The government claims that, on November 1, 2022, Scott was captured on a recorded call intercepted pursuant to a court-authorized wiretap on the cellphone of his associate, Douglas Welch (the "Welch Wire"). The government further claims that, during the call, Scott described three women working for him in prostitution, including Jane Does 1 and 2. (*Id.* at 8.) Among other things, the government claims that Scott described the hours that each woman worked in prostitution on the Penn Track, the money they typically made for him, and the method by which Scott kept tabs on these women and their work. (*Id.*) Scott purportedly also

5

discussed putting certain women in nightclubs in Manhattan, both to work in prostitution and to steal watches from prostitution customers for him. (*Id.*) In addition, Scott purportedly also described acts of violence against Jane Doe 1 after she failed to move quickly enough with potential prostitution customers at nightclubs. (*Id.* at 8-9.)

## II. Procedural History

Scott was charged on April 18, 2024, by a grand jury sitting in the Eastern District of New York, with charges of promotion of prostitution, sex trafficking, and murder in the course of sex trafficking. (ECF No. 1, Indictment.) An arrest warrant was issued, (ECF No. 2), Scott was arrested, and, following an April 19, 2024 arraignment during which he pleaded not guilty to all counts of the Indictment, Scott was held in pretrial detention. (ECF Nos. 8 & 10.) Scott filed the Motion to Dismiss Count Four on January 27, 2025, and the Motion to Suppress on February 5, 2025. (*See* ECF Nos. 44 & 48.)

## LEGAL STANDARDS

### I. Motion to Dismiss

A party may raise by pre-trial motion any "defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Such motions include motions alleging a "defect in the indictment." Fed. R. Crim. P. 12(b)(3)(B).

## II. Motion to Suppress

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV; *accord Maryland v. Pringle*, 540 U.S. 366, 369 (2003). A defendant who contends that his Fourth Amendment rights were violated by reason of an illegal search or seizure may, by filing a motion to suppress, seek to prohibit the government from using the fruits of such search or seizure in a prosecution against that defendant. *See, e.g.*, *United States v. Pena*, 961 F.2d 333, 336 (2d Cir. 1992); *see also* Fed. R. Crim. P. 12(b)(3)(C), 41(h).

"[A]n evidentiary hearing on a motion to suppress ordinarily is required if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable to court to conclude that contested issues of fact going to the validity of the search are in question.'" *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) (quoting *Pena*, 961 F.2d at 339). But if the facts asserted by a defendant, even if credited, "fail[] to show that he could challenge the search under the Fourth Amendment," then no hearing is required. *Id.*

## DISCUSSION

## I. Motion to Dismiss

Count Four of the Indictment alleges that on or about May 1,

7

2023, in the Eastern District of New York, Scott, together with co-defendant Simmons and others, "knowingly and intentionally murder[ed]" Cleveland Clay in violation of 18 U.S.C. § 2245. (Indictment ¶ 4.)

Section 2245, entitled "Offenses resulting in death," provides in relevant part:

> A person who, in the course of an offense under this chapter, or section 1591, 2251, 2251A, 2260, 2421, 2422, 2423, 2425, murders an individual, shall be punished by death or imprisoned for any term of years or for life.

18 U.S.C. § 2245. Scott's underlying predicate offenses arise from violations of § 1591(a) (sex trafficking of children or by force, fraud or coercion).[1]

Scott seeks to dismiss Count Four of the Indictment on the grounds that "[Section] 2245 was not intended to apply to the death of a person who was not an alleged victim of the predicate offense." (Mot. to Dismiss at 1.) In opposition, the government argues that the plain language of § 2245 is "not limited to victims

---

[1] 18 U.S.C. § 1591(a) provides as follows:

(a) Whoever knowingly–

(1) in or affecting interstate or foreign commerce, . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing . . . that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

8

of the underlying predicate offense; instead, Section 2245 applies to the murder of *any* individual committed in the course of a predicate offense – here, sex trafficking." (Opp. at 13 (emphasis retained).)  For the reasons stated below, the Court agrees with the government that the plain and clear language in § 2245 encompasses any "individual" killed in the course of the underlying predicate offense.

The Supreme Court has required that "when [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Sebelius v. Cloer*, 569 U.S. 369, 381 (2013) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (finding that where "the words of the statute are unambiguous, the judicial inquiry is complete") (citation omitted).  As stated by the Second Circuit, "[i]t is axiomatic that the plain language of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms.  Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous."  *In re Venture Mortg. Fund, L.P.*, 282 F.3d 185, 188 (2d Cir. 2002) (quoting *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999)).

Here, Section 2245's language is clear: the applicability of

9

this section extends to the killing of any "individual" in the course of the predicate offense. *See* 18 U.S.C. § 2245. There is no other reasonable interpretation of the plain statutory language, nor is there any statutory language limiting § 2245's application to a particular type of "individual." The conclusion that Scott urges – that § 2245's applicability be limited by the identity of the murder victim – is unsupportable by the plain language of § 2245.

Though the Court's analysis need not continue in light of the unambiguous statutory language, the Court finds further support for its conclusion when examining the other provisions within the same statutory scheme. Specifically, the Court notes that 18 U.S.C. § 2260A, which was passed at the same time as § 2245's amendment in the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587 (2006), provides in relevant part that:

> Whoever, being required by Federal or other law to register as a sex offender, commits a felony offense involving a minor under section [*inter alia*] . . . 2245 . . . shall be sentenced to a term of imprisonment of 10 years in addition to the imprisonment imposed for the offense under that provision.

18 U.S.C. § 2260A. As demonstrated in § 2260A, Congress can limit the applications of certain sections to certain types of victims (i.e., minor victims in § 2260A). Any limiting language is wholly absent from § 2245. Had Congress intended to limit the types of

10

"individual" murder victims in § 2245, Congress simply could have used the same type of precise language that it uses in § 2260A, an adjacent section within the same Act. Congress did not use limiting language, and the Court may not read in such language but instead is bound by the plain language that Congress did elect to use. *See Russello v. United* States, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (cleaned up); *cf. United States v. Rosado*, No. 20-cr-3(JSR), 2021 WL 2292856, at *4 (S.D.N.Y. June 4, 2021) (finding language involving "minors" in § 2260A to involve both actual and perceived minors where Congress could have used language of "actual minors" from adjacent section, § 2252A, but declined to do so).

Scott's reliance on a single, out-of-context sentence in *Kennedy v. Louisiana*, 554 U.S. 407 (2008), to argue that § 2245 should be limited to victims of sexual assault or exploitation is unavailing. (ECF No. 52, "Def. Reply" at 3.) First, *Kennedy* is inapposite here. In *Kennedy*, the Supreme Court considered whether the death penalty is a constitutional sentence for a conviction, under Louisiana state law, of child rape not resulting in death. *See Kennedy*, 554 U.S. at 413. The Supreme Court ultimately held that, a death sentence for the crime of raping, but not killing or

11

assisting another in killing, a child is unconstitutional under the Eighth and Fourteenth Amendment. *Kennedy*, 554 U.S. at 421. In its single mention of § 2245, *Kennedy* uses § 2245 as an example where, in federal law, an offender becomes eligible for the death penalty only when the rape results in a death. *Id.* at 423. *Kennedy* does not otherwise discuss or analyze the language or limitations of § 2245, and certainly does not stand for the proposition that § 2245 is limited solely to victims of sexual assault or exploitation.

Second, a single sentence of dicta, even if it is from the Supreme Court, does not supersede the plain statutory language. *See NCAA v. Alston*, 594 U.S. 69, 93 (2021) ("aside" and "stray comments" are not binding); *id.* at 108 (Kavanaugh, J., concurring) ("The Court makes clear that the decades-old 'stray-comments' . . . were dicta and have no bearing on [the current case]."); *Ohio v. Clark*, 576 U.S. 237, 253 (2015) (Scalia, J., concurring in the judgment) ("[S]nide detractions do no harm; they are just indications of motive. Dicta on legal points, however, can do harm, because though they are not binding they can mislead."); *Jama v. ICE*, 543 U.S. 335, 351 n.12 (2005) ("Dictum settles nothing, even in the court that utters it."). As discussed above, the Supreme Court in *Kennedy* did not conduct any meaningful interpretation of § 2245, and did not rely on a limited definition of "individual" to reach its holding. Accordingly, this Court

12

declines to adopt Scott's proposed limitation based on a single sentence of non-binding dictum.

Scott urges the Court to apply the "rule of lenity" to conclude that § 2245 only applies to murder committed against victims of sexual abuse or exploitation. (Mot. to Dismiss at 9-10.) The rule of lenity, however, has "no application where the meaning of the provision at issue is clear." *United States v. Gitten*, 231 F.3d 77, 81-82 (2d Cir. 2000); *see generally Salinas v. United States*, 522 U.S. 52, 66 (1997) (rule of lenity "does not apply when a statute is unambiguous or when invoked to engraft an illogical requirement to its text"); *United States v. Turkette*, 452 U.S. 576, 587 n.10 (1981) ("rule of lenity" serves to aid the court in interpreting a criminal statute only if there is an ambiguity, and "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers"). The rule of lenity is not applicable here, given the Court's conclusion that § 2245 unambiguously applies to murders committed against any individual during the course of a predicate offense.

## II.  Motion to Suppress

Scott seeks to suppress the fruits of the October 25, 2022, electronic surveillance Order authorizing the interception of electronic communications on the Welch Phone (the "Welch Wire"). (*See generally* Mot. to Suppress.)

13

Wiretap warrants are governed by 18 U.S.C. § 2518 (also referred to as "Title III"). Section 2518(3) requires that "before ordering the interception of wire communications, a judge must determine, based on the facts presented in an affidavit, that (1) there is probable cause to believe that an individual is committing, has committed, or is about to commit, a crime; (2) there is probable cause that communications about the crime will be obtained through the wiretap; (3) alternative means have failed or are too dangerous or unlikely to succeed; and (4) there is probable cause to believe that the premises to be wiretapped are being used for criminal purposes or are used or owned by the target of the wiretap." *United States v. Ambrosio*, 898 F. Supp. 177, 181 (S.D.N.Y. 1995) (citing *United States v. Wagner*, 989 F.2d 69, 71 (2d Cir. 1993)).

Probable cause is established if the "totality of the circumstances" contained in the affidavit indicates a probability of criminal activity and that evidence of the criminal activity could be obtained through the use of electronic surveillance. *See United States v. Rowell*, 903 F.2d 899, 901-03 (2d Cir. 1990). Thus, *prima facie* proof is not required; rather, only a probability of criminal activity needs to be established by the affidavit. *Wagner*, 989 F.2d at 72 (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)). Affidavits made in support of a wiretap warrant must be read as a whole and construed in a "realistic and common-sense

14

manner, so that [their] purpose is not frustrated." *United States v. Ruggiero*, 824 F. Supp. 379, 399 (S.D.N.Y. 1993) (citing *United States v. Harris*, 403 U.S. 573, 577-79 (1971)), *aff'd sub nom. United States v. Aulicino*, 44 F.3d 1102 (2d Cir. 1995).

Wiretap orders, like search warrants, are entitled to a presumption of validity. *United States v. Fury*, 554 F.2d 522, 530 (2d Cir. 1977). A reviewing court must defer to the issuing court's determination that there was probable cause "as long as there existed a substantial basis for a magistrate or judge to conclude that a search would uncover evidence of wrong-doing." *United States v. Biaggi*, 853 F.2d 89, 95 (2d Cir. 1988). As the Supreme Court emphasized in *United States v. Leon*, "[r]easonable minds frequently differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." 468 U.S. 897, 914 (1984) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). The ultimate standard is simply whether there was a "substantial basis" for the issuing judge's determination of probable cause. *Gates*, 462 U.S. at 236 (citation omitted).

Scott, however, does not argue that there was no probable cause to believe that evidence of criminal activity would be obtained from the interception. In fact, Scott concedes that the

15

government had "plenty of evidence that the criminal conduct of the other named targets [of the wiretap warrant] was continuing[.]"[2] (Mot. to Suppress at 7.) Scott argues instead that "[p]robable cause was not established to believe that Scott was currently involved in sex trafficking crimes" and that "there was no evidence that Scott was engaged in any such conduct when the electronic surveillance order was obtained." (Mot. to Suppress at 5, 7.)

As an initial matter, the government contends that Scott fails to establish standing to suppress the wire evidence because he did not initially submit with his motion "sworn evidence, in the form of affidavit of testimony" establishing that it was his voice captured on the wiretap. *United States v. Rodriguez*, No. 08-cr-1311(RPP), 2009 WL 2569116, at *4 (S.D.N.Y. Aug. 20, 2009); (Opp. at 22-23.) Given that Scott has since submitted a sworn affidavit attesting to his voice being captured on the Welch wiretap, Scott has sufficiently established standing. (*See* ECF No. 52-1.)

Contrary to Scott's assertions, a court does not need to find that there was probable cause that Scott specifically engaged in

---

[2] The evidence referenced in the Gander Affidavit include: (1) cell phone evidence between January 8, 2022 to February 24, 2022, (2) social media evidence between August 11, 2020 to February 2022, (3) witness statements, (4) observations of certain target interceptees in the vicinity of the Penn Track between June and September 2022, and (5) phone records and/or court-authorized pen register and trap and trace data through October 12, 2022. (Gander Aff. ¶¶ 27-47, 51; *see also* Mot. to Suppress at 7.)

16

criminal activity in order to issue the warrant.[3] *See United States v. Ambrosio*, 898 F. Supp. 177, 184 (S.D.N.Y. 1995). Rather, the relevant inquiry was whether the conversations sought to monitored on the Welch phone were likely to contain evidence of a crime. *See United States v. McGuinness*, 764 F. Supp. 888, 900 (S.D.N.Y. 1991) (required showing for issuance of wiretap warrant is sufficient information to believe that telephone in question is being used in an illegal operation); *United States v. Shipp*, 578 F. Supp. 980 (S.D.N.Y. 1984) (holding that the probable cause requirement in the wiretap context is "satisfied by identification of the telephone line to be tapped and the particular conversations to be seized." (quoting *United States v. Donovan*, 429 U.S. 413, 427 (1977))). Because there is no dispute that the Gander Affidavit provided sufficient probable cause as to the other named individuals, Scott's motion to suppress the products of the Welch Wire is denied.

---

[3] Even if, *arguendo*, there was no probable cause as to Scott, the Gander Affidavit's naming of Scott as a potential interceptee is not grounds for suppression. "Since nothing in the statute restricts the Government from naming in the affidavit individuals as to whom it may not have probable cause, the statute's goal of providing notice is actually furthered by naming more, rather than fewer, persons." *Ambrosio*, 898 F. Supp. at 184; *see United States v. Milan-Colon*, No. 91-cr-685(SWK), 1992 WL 236218, at *16 (S.D.N.Y. Sept. 8, 1992) (holding over-inclusion of persons in wiretap affidavit is not a cause for suppression but rather "furthers the policy of preventing unreasonable invasions of privacy" by ensuring that persons will be given notice of the order and intercepted communications). Indeed, "[i]t would be anomalous to punish the government by suppressing the wiretap evidence for naming [a defendant] in the affidavit when it could constitutionally *not* have named him and still have intercepted his calls." *Ambrosio*, 898 F. Supp. at 184 (emphasis in original).

17

## **CONCLUSION**

For the foregoing reasons, Scott's motion to dismiss Count Four of the Indictment is respectfully denied, and Scott's motion to suppress the product of the Welch Wire is also denied.

**So ordered.**

Dated:     April 1, 2025
           Brooklyn, New York
           _____
           **Hon. Kiyo A. Matsumoto**
           United States District Judge
           Eastern District of New York