UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------X

UNITED STATES OF AMERICA,

    - against -               **MEMORANDUM & ORDER**

OMARI SCOTT,                   24-CR-158 (KAM)

          *Defendant*.

----------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

On June 9, 2025, following a multi-week trial, a jury found Defendant Omari Scott ("Defendant" or "Scott") guilty of one count of sex trafficking of Aaliyah Ruiz ("Ruiz") in violation of 18 U.S.C. § 1591(a) ("Count One") and one count of murder in the course of sex trafficking Ms. Ruiz in violation of 18 U.S.C. § 2245 ("Count Two").

Presently before the Court is Mr. Scott's motion for acquittal pursuant to Federal Rule of Criminal Procedure 29(c), or in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33. (ECF No. 131-1, "Def. Mot.") For the reasons set forth below, Mr. Scott's motions are respectfully **DENIED**.

**BACKGROUND**

**I.   The Charges**

On April 18, 2024, Mr. Scott was charged by indictment with (1) promotion of prostitution, in violation of 18 U.S.C.

§ 1952(a)(3)(A); (2) sex trafficking of Alicia Lee, in violation of 18 U.S.C. § 1591(a); (3) sex trafficking of Aaliyah Ruiz, in violation of 18 U.S.C. § 1591(a) ("Count One"); and (4) murdering Cleveland Clay ("Clay") in the course of sex trafficking Aaliyah Ruiz, in violation of 18 U.S.C. § 2245 ("Count Two").  (ECF No. 1, the "Indictment.")  On May 16, 2025, Mr. Scott pleaded guilty to promoting prostitution and sex trafficking Ms. Lee.  Mr. Scott then proceeded to trial on Counts One and Two.

## II.  The Trial and Jury Verdict

Jury selection for Mr. Scott's trial commenced on May 19, 2025, and trial commenced shortly thereafter on the same date. (*See* Minute Entry dated May 19, 2025.)  After preliminary instructions by the Court and opening statements by both parties, the government presented its case-in-chief over the course of eight days.  On May 27, 2025, outside the presence of the jury but in Mr. Scott's presence, the Court held a charging conference with the parties.  (Tr.[1] 1320-57.)  The government rested on May 27, 2025.  (*Id.* 1298.)

After the government rested, Mr. Scott orally moved for a judgment of acquittal pursuant to Rule 29.  (*Id.* 1299-1300.)  The Court reserved judgment on the motion and set a schedule for post-

---

[1] Citations to "Tr." refer to the transcript of Mr. Scott's trial in this action, which commenced on May 19, 2025 and concluded on June 9, 2025, when the jury returned a verdict of guilty on both counts.

trial briefing.  (*Id.* 1301.)  Mr. Scott then presented a defense case and rested on May 29, 2025.  (*Id.* 1403.)  On May 29, 2025, both parties presented their closing arguments to the jury and the Court charged the jury.  (*Id.* 1404-1533.)  On June 9, 2025, following its deliberations, the jury convicted Mr. Scott of Counts One and Two.  (*See* Minute Entry dated June 9, 2025.)

## LEGAL STANDARDS

### I.    Rule 29 Motion for a Judgment of Acquittal

In deciding a Rule 29 motion, a court should "avoid usurping the role of the jury," and cannot "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (alterations adopted) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)).  A court must consider the totality of the evidence "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. White*, 7 F.4th 90, 98 (2d Cir. 2021) (quoting *United States v. Aquart*, 912 F.3d 1, 17 (2d Cir. 2018)); *see United States v. Archer*, 977 F.3d 181, 188-89 (2d Cir. 2020) (A court must "defer to the jury's resolution of conflicting evidence[.]").  A court must also evaluate the evidence in a sufficiency challenge "in conjunction," rather than

"piecemeal or in isolation." *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019).

Ultimately, a court may enter a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Guadagna*, 183 F.3d at 130 (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)). Thus, a defendant challenging his conviction on sufficiency grounds "faces a heavy burden, as the standard of review is exceedingly deferential to the jury's apparent determinations." *United States v. Davis*, No. 21-1486, 2023 WL 4582002, at *1 (2d Cir. July 18, 2023) (alteration adopted) (quoting *United States v. Flores*, 945 F.3d 687, 710 (2d Cir. 2019)).

## II.  **Rule 33 Motion for a New Trial**

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)); *see also United States v. Walker*, 974 F.3d 193, 208 (2d Cir. 2020) ("In determining

whether to grant a Rule 33 motion, the ultimate test is whether letting a guilty verdict stand would be a manifest injustice." (alteration adopted) (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005))); *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) ("Generally, a motion for a new trial 'should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" (quoting *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003))).

Although the Second Circuit "generally allow[s] district courts greater deference to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, courts must nonetheless exercise Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Coté*, 544 F.3d 88, 101 (2d Cir. 2008) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

## DISCUSSION

### I.   Rule 29: Sex Trafficking of Aaliyah Ruiz (Count One)

Mr. Scott argues that this Court should overturn the jury's verdict as to Count One, Sex Trafficking of Aaliyah Ruiz, in violation of 18 U.S.C. § 1591(a), because "[t]he evidence supporting the charge of sex trafficking was meager and not legally sufficient to support the jury's verdict." (Def. Mot. at 2.) For the reasons set forth below, the Court finds abundant evidence

supporting the jury's conviction of Mr. Scott as to Count One.

**A.  Legal Standard**

Following a charging conference at which the parties were fully heard, the Court charged the jury that, to find Mr. Scott guilty of sex trafficking in violation of § 1591(a), the government must prove beyond a reasonable doubt: (1) that the defendant knowingly recruited, enticed, harbored, transported, provided, obtained or maintained a person by any means, or the defendant knowingly benefited financially or by receiving something of value from participating in a venture that recruited, enticed, transported, provided, obtained or maintained a person; (2) that the defendant knew or acted in reckless disregard of the fact that means of force, threats of force, fraud, or coercion or any combination would be used to cause a person to engage in a commercial sex act; and (3) that the defendant's conduct was in or affecting interstate commerce.   (Tr. 1576-77); Sand, Modern Federal Jury Instructions—Criminal, Instructions ("Sand Criminal Instructions") 47A-17, 47A-18.

As to the second element requiring the government prove "force, threats of force, fraud, or coercion," the Court instructed the jury that "force" means "any form of power, violence or physical pressure directed against another person."  (Tr. 1580.) The jury was further instructed that "fraud," as defined in the second element, means "the defendant knowingly made a

misstatement, misrepresentation or omission of a material fact to entice the victim." (*Id.*) A "material fact" is "one that a reasonable person would expect to rely on when making a decision." (*Id.* 1581.) "Coercion" means either "a threat of serious harm or physical restraint against a person," or "any scheme, plan or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against a person," or "the abuse or threatened abuse of law or legal process." (*Id.*) A "threat" for the purposes of coercion, is defined as "a serious statement expressing an intention to inflict harm at once or in the future . . . A statement is a threat if it was made under such circumstances that a reasonable person hearing the statement would understand it as a serious expression of intent to cause harm." (*Id.*) The term "serious harm" includes "physical and nonphysical types of harm, including psychological, financial or reputational harm that is sufficient under all surrounding circumstances to compel a reasonable person in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid such harm." (*Id.*) In considering whether Mr. Scott made a threat of serious harm, the Court charged the jury to consider "the victim's station in life, physical and mental condition, age, educational level, experiences, and intelligence." (*Id.* 1581-82); Sand Criminal Instructions, 47A-17, 47A-18.

### B.     Sufficiency of the Evidence

There is ample evidence before the jury to convict Mr. Scott on Count One, which charges him with the sex trafficking of Aaliyah Ruiz between August 2022 and June 2023.

First, as Mr. Scott concedes, the evidence showed that Mr. Scott was Ms. Ruiz's pimp for several months in 2022 and 2023. (Def. Mot. at 2.)  In August 2022, Ms. Ruiz and Mr. Scott exchange text messages where Mr. Scott recruited and enticed her, and expressed hope that Ms. Ruiz would be an "addition" to his group of prostitutes.  (Government Exhibit ("GX") 683_15.)  To his associates, Mr. Scott describes Ms. Ruiz as his "turnout," or in other words, his prostitute who had not previously engaged in sex work until he recruited and enticed her to engage in sex work on his behalf.  (GX 317; Tr. 404:2-10.)  To one of his other prostitutes, Alicia Lee, Mr. Scott describes his relationship with Ms. Ruiz as one where he is trying to maintain and build her into the best prostitute she can be, so he could obtain her earnings. (GX 740 (Mr. Scott describing, in text messages to Ms. Lee, his actions towards Ms. Ruiz as "pimping, getting to know her, learn her, teach her, make her great."))  As the evidence showed, Ms. Ruiz was not only one of Mr. Scott's prostitutes, but also one of his top earners who benefitted him financially.  (Tr. 673-74.)

Second, there is ample evidence that Mr. Scott used force, fraud, coercion, threats of force, or a combination thereof, in

causing Ms. Ruiz to engage in commercial sex acts.  Ms. Lee, Mr. one of Scott's other prostitutes, testified that Mr. Scott physically abused her in front of Ms. Ruiz.  (Tr. 514, 577-78; GX 676.)  Ms. Lee testified that Ms. Ruiz would initially try to stop Mr. Scott from hitting Ms. Lee but eventually stopped trying to intervene.  (Tr. 578, 610.)   Documentary evidence, including photographs and videos, corroborate Ms. Lee's testimony regarding Mr. Scott's physical abuse.  (GX 3, 675, 676, 677.)   On an intercepted phone call with Douglas Welch, Mr. Scott's associate, Mr. Scott said he need not "do anything" to Ms. Ruiz because his abuse of Ms. Lee served as a "great example" of what Mr. Scott would do to Ms. Ruiz if she disobeyed him.  (GX 317.)

Mr. Scott, however, did not limit his physical abuse and threats of harm to Ms. Lee.  As the government proved through witness testimony, Mr. Scott also coerced, abused, and threatened to harm Ms. Ruiz.  First, Amanda Vizcarrondo-Ortiz, another woman working for Mr. Scott in prostitution, testified to personally witnessing Mr. Scott physically assault Ms. Ruiz while they were in Mr. Scott's car.  (*Id.* 1014, 1016-18.)  Second, a witness – testifying under the name "Francisca" – lived next door to Ms. Ruiz and testified to hearing a man and woman loudly arguing, and then hearing the woman scream "help" in the adjacent apartment. (Tr. 968.)  Francisca called the police, (*Id.* 968-69), and audio captured on the responding officers' body camera corroborates

Francisca's testimony of Mr. Scott yelling at Ms. Ruiz. (*See* GX 186.)

Ms. Ruiz herself discussed Mr. Scott's abuse. Ms. Ruiz texted Mr. Scott that he was "screaming" at her and "putting [his] hands on [her]," to which Mr. Scott responded that Ms. Ruiz was not getting results. (GX 683_5.) The jury heard from Mr. Scott himself on an intercepted phone call with an incarcerated associate, stating that he was going to "violate" and "fuck[] up" Ms. Ruiz. (GX 303.) The jury also saw video evidence of Mr. Scott driving his car up to Ms. Ruiz, exiting his car, and yanking and dragging Ms. Ruiz by her hair into his car. (GX 100, 303.) Contrary to Mr. Scott's contention, (Def. Mot. at 3), the overwhelming evidence showed that this violent physical use of force was not an isolated incident, and even if it were, the evidence is sufficient to convict Mr. Scott.

Beyond physical force and threats of physical force, the evidence also showed that Mr. Scott exerted control over Ms. Ruiz and her life. As to Ms. Ruiz's work on the Penn Track, Mr. Scott monitored Ms. Ruiz's real-time location on the Life360 application, controlled when Ms. Ruiz could leave the Penn Track, when she could stop engaging in commercial sex acts each night, how much money she needed to earn before he was satisfied, when she could step out from the cold, when she could spend any money that she earned for Mr. Scott, and when she could change her shoes.

(GX 515_6, 683_6, 683_21, 683_2, 683_5, 683_7; Tr. 574.)  Off the Penn Track, Mr. Scott controlled which menstrual products Ms. Ruiz could use and decided whether Ms. Ruiz could go to the hospital when she was hurt.  (GX 683 at 39, 683_6.)

Despite making Mr. Scott thousands of dollars on the Penn Track by performing commercial sex acts, Ms. Ruiz had no money of her own.  Instead, Ms. Ruiz depended on Mr. Scott financially, including for essentials such as diapers (GX 515_7), menstrual products (GX 683_18), clothing for her child (GX 683_9), and transportation back to the shelter where Ms. Ruiz lived (GX 683_10).

Ms. Ruiz tried multiple times to leave Mr. Scott but was unsuccessful.  She first tried to leave Mr. Scott in January 2023 for Justin Dixon ("Justo").  (GX 300, 593_15.)  Justo, however, was arrested before Ms. Ruiz was able to leave Mr. Scott, and Ms. Ruiz was subsequently punished by Mr. Scott for her attempt to leave and warned not to do it again.  (Tr. 678-79; GX 300, 683_12 (Mr. Scott telling Ms. Ruiz "Stay that way and shit gone be straight."))  Ms. Ruiz then tried to leave Mr. Scott in April 2023 for Cleveland Clay.  This time, as Ms. Ruiz attempted to leave Mr. Scott, Mr. Scott ordered Michael Simmons to murder Mr. Clay.  (Tr. 632-34.)  As discussed further below, Mr. Scott drove, with Ms. Ruiz in his passenger seat, to meet Mr. Simmons on the morning of May 1, 2023, the day of Mr. Clay's murder.  (Tr. 721-23.)  While

Ms. Ruiz stayed in Mr. Scott's car, Mr. Scott exited his car, entered Mr. Simmons's adjacently parked car, and handed Mr. Simmons a gun. (*Id.*) Mr. Simmons and Mr. Scott both understood that Mr. Simmons would use the gun to kill Mr. Clay. (Tr. 722:24-723:6.) Mr. Simmons then walked over to Mr. Clay's location and shot and killed Mr. Clay with Mr. Scott's gun. (*See* GX 100; Tr. 729-30.) Ms. Ruiz, having now tried twice unsuccessfully to leave Mr. Scott, continued to work for Mr. Scott in prostitution.

The jury was permitted to credit all the aforementioned evidence in finding that Ms. Ruiz was recruited, threatened, forced, abused, and coerced into working for Mr. Scott as his prostitute and engaging in commercial sex acts for his financial benefit, before and after Mr. Scott ordered the murder of the rival pimp that Ms. Ruiz was trying to leave him for. *See United States v. Elias*, 619 F. Supp. 3d 296, 304 (E.D.N.Y. 2022) (citing *United States v. Rea*, 958 F.2d 1206, 1222 (E.D.N.Y. 1992)) (noting the "jury was entitled to credit each piece of [the aforementioned] evidence in reaching its verdict . . . [and] this court will not now second-guess the jury's assessments.") The abundant evidence that Mr. Scott sex trafficked Ms. Ruiz was "not incredible on its face," *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) (internal quotations omitted), and it was thus for the jury to find beyond a reasonable doubt that Mr. Scott recruited, threatened, forced, and coerced Ms. Ruiz into engaging in

commercial sex acts. *See United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) ("[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court.").

Finally, there is ample evidence that Mr. Scott's trafficking of Ms. Ruiz was in or affecting interstate commerce. First, Mr. Scott brought and transported Ms. Lee and Ms. Ruiz across state lines from New York to Atlantic City, New Jersey to work in prostitution. (Tr. 537:25-538:3.) Additionally, Mr. Scott's use of his cell phone in conducting his prostitution activities and in trafficking Ms. Ruiz had a sufficient impact on interstate commerce. *See United States v. Garrett*, No. 17-59, 2022 WL 2979588, at *3 (2d Cir. July 28, 2022) (citing *United States v. Giordano*, 442 F.3d 30, 39 (2d Cir. 2006) (finding it an "unremarkable conclusion that the national telephone network" satisfies the interstate commerce element)). Accordingly, the Court will not disturb the jury's finding that Mr. Scott sex trafficked Aaliyah Ruiz in violation of 18 U.S.C. § 1591(a), as charged in Count One.

## II. Rule 29: Murder of Cleveland Clay (Count Two)

Mr. Scott argues that this Court should overturn the jury's verdict as to Count Two, Murder of Cleveland Clay, in violation of 18 U.S.C. § 2245. Mr. Scott's sole argument as to Count Two is contingent upon the Court overturning his conviction on Count One.

(Def. Mot. at 1, n.1.)  Because the Court finds fulsome evidence supporting the jury's conviction of Mr. Scott as to Count One and independently sufficient evidence supporting the jury's conviction of Mr. Scott as to Count Two, Mr. Scott's motion for acquittal on Count Two is denied.

### A.    Legal Standard

To convict Mr. Scott of the murder of Mr. Clay, the government must prove beyond a reasonable doubt that: (1) Mr. Scott or another person whom he aided and abetted unlawfully killed Cleveland Clay; (2) Mr. Scott acted with malice aforethought; and (3) the unlawful killing occurred in the course of sex trafficking Aaliyah Ruiz. (Tr. 1585-87.)

The jury was further instructed that, under the aiding and abetting statute, "it is not necessary for the government to show that a defendant himself physically committed the crime with which he is charged in order for you to find the government to have sustained its burden of proof." (*Id.* 1566.)  As to the element of "malice aforethought," the Court instructed the jury that "[m]alice is the state of mind that would cause a person to act without regard to the life of another."  (Tr. 1586.)

**B.    Sufficiency of the Evidence**

As with Count One, there is abundant evidence to support the jury's conviction of Mr. Scott on Count Two which charges Mr. Scott of murdering Cleveland Clay in violation of 18 U.S.C. § 2245.

Mr. Simmons testified that, on May 1, 2023, Mr. Scott asked him to shoot Mr. Clay over a "prostitution dispute[.]" (Tr. 632-34.)  Mr. Simmons subsequently shot Mr. Clay approximately five times at close range. (Tr. 634-35; GX 100.)  It is well-settled that, by ordering Mr. Simmons to kill Mr. Clay, Mr. Scott is guilty of the murder as if he committed it directly. *See Nye & Nissen v. United States*, 336 U.S. 613, 618 (1949) (finding "one who aids abets, counsels, commands, induces, or procures the commission of an act is as responsible for that act as if he committed it directly") (internal quotations omitted).

Mr. Simmons's testimony proved that Mr. Scott acted with malice aforethought. Mr. Simmons testified that, after Mr. Scott discovered Ms. Ruiz's plan to leave him for Mr. Clay, he gave Mr. Simmons a gun and asked him whether he was going to "put [Mr. Clay] down." (Tr. 723.)  Mr. Simmons answered in the affirmative. (*Id.*)  Mr. Scott confirmed with Mr. Simmons that he had wiped his fingerprints off the gun, and that he knew he would not receive the gun back. (*Id.* 724.)  Mr. Scott then reassured Mr. Simmons that he would "take care" of him while he was in prison and that he would send money to him. (*Id.* 725.)  The jury was permitted to

15

credit Mr. Simmons's testimony in concluding that Mr. Scott intended to kill or cause a serious risk of death to Mr. Clay, and the Court must "defer to the jury's assessment of witness credibility[.]" *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002).

Finally, abundant evidence in the record proved that Mr. Scott murdered Mr. Clay in the course of sex trafficking Ms. Ruiz. On April 30, 2023, after Mr. Scott discovered that Ms. Ruiz was trying to leave him for Mr. Clay, (*see* Tr. 693-94), Mr. Scott "went and took her back" from Mr. Clay. (*Id.*) Later that same morning, Mr. Scott and Mr. Clay began arguing outside the White Castle on Sheffield Avenue after Mr. Clay accused Mr. Scott of "kidnapping" Ms. Ruiz. (*Id.* 695-96.) The argument escalated, and Mr. Scott and Mr. Clay began swinging at each other before being pulled apart. (*Id.* 697-99.) After leaving the White Castle, Mr. Scott went to get a gun. (*Id.* 699-700.)

In the early morning on May 1, 2023, at approximately 5:15 A.M., Mr. Scott, along with Mr. Simmons, met Mr. Clay outside a CubeSmart storage facility located at 486 Stanley Avenue, Brooklyn, New York. (*Id.* 704-16; GX 100.) Video evidence showed Mr. Scott, Mr. Simmons, and Mr. Clay in heated conversation for approximately 15 minutes, after which Mr. Clay parted ways with Mr. Scott and Mr. Simmons. (GX 110, 111.) Mr. Simmons testified that, throughout that conversation, Mr. Scott admitted to

kidnapping Ms. Ruiz and stated that she belonged to him. (Tr. 713-14.) Following that discussion, Mr. Scott said to Mr. Simmons, in substance, that if Mr. Clay did not back off of Ms. Ruiz, Mr. Clay would be killed. (*Id.* 716-17.) In response, Mr. Simmons told Mr. Scott, "I'm with you," and confirmed he would carry out the murder for Mr. Scott later that morning. (*Id.* 717:3-13; 720:12-23.) Mr. Simmons also testified at trial that he and Mr. Scott killed Mr. Clay because Ms. Ruiz left Mr. Scott and "decided to choose" Mr. Clay as her pimp. (*Id.* 634.)

Later that day, after Mr. Scott's argument with Mr. Clay outside the CubeSmart facility, Mr. Simmons witnessed Mr. Clay pressuring Ms. Ruiz to again leave Mr. Scott. (*Id.* 718-19.) As Mr. Simmons observed Mr. Clay's pressure tactics, he received a call from Mr. Scott confirming that Mr. Simmons should carry out the murder as they had discussed earlier that morning. (*Id.* 720:7-25.) At approximately 8:00 A.M., Mr. Scott and Mr. Simmons met in a laundromat parking lot located at 762 Sheffield Avenue. (GX 143; Tr. 721.) Video evidence depicts Mr. Simmons changing into all black clothes and then entering Mr. Scott's car. (GX 143.) Mr. Scott and Mr. Simmons sat in Mr. Scott's car for approximately three minutes before Mr. Simmons exited the car and started walking towards Mr. Clay's location, a White Castle restaurant located on the Penn Track. (*Id.*) Several minutes later, surveillance video of the White Castle parking lot showed Mr. Simmons walking up and

17

firing multiple shots at Mr. Clay. (GX 100.) Mr. Clay is shown limping away before exiting the video frame. (*Id.*) Shawnise Dymond, Mr. Clay's girlfriend and prostitute, testified that, after the shooting, Mr. Clay stumbled back into his car with gunshot wounds to his stomach and tried to drive away. (Tr. 269-71.) Ms. Dymond then called 911 and Mr. Clay was transported to a hospital where he succumbed to his injuries. (Tr. 257-28, 269-71; GX 167.) At trial, the medical examiner testified that Mr. Clay died from the gunshot injuries. (Tr. 351-52.)

Accordingly, the jury was permitted to credit all the aforementioned evidence in finding Mr. Scott guilty of Count Two, the murder of Cleveland Clay in the course of sex trafficking Aaliyah Ruiz in violation of 18 U.S.C. § 2245.

## III. Rule 33: Motion for New Trial

In the alternative to his Rule 29 motion, Mr. Scott moves for a new trial pursuant to Rule 33. In deciding a Rule 33 motion, a court must determine if manifest injustice would result from allowing the guilty verdict to stand. *See United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013) (citation omitted); *United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006) (motions for new trial "should be granted only with great caution and in the most extraordinary circumstances").

Mr. Scott asserts that a new trial is warranted based upon the Court's decision declining to compel the government to grant

18

blanket immunity to Ms. Ruiz. This argument is unavailing. As the Court found during trial, Mr. Scott failed to establish any "extraordinary circumstances" compelling the government to grant Ms. Ruiz immunity. In assessing whether "extraordinary circumstances" exist, the Court considered and weighed several factors set forth by the Second Circuit in *United States v. Bahadar*, 954 F.2d 821, 826 (2d Cir. 1992):

> (1) first, the district court must find that the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the Fifth Amendment; (2) second, the witness's testimony must be material, exculpatory, and not cumulative; and (3) third, the testimony must be unobtainable from any other source.

*Bahadar*, 954 F.2d at 826. The Court concluded then – as it does now – that Mr. Scott failed to meet his burden of demonstrating the first *Bahadar* element and thus did not reach the second and third elements. *See United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988) ("The defendant bears the burden of convincing the court that each of these elements is present.")

First, the government exercising its discretion in granting immunity to certain witnesses and not others is not, without more, "discriminatory" behavior. *See Diaz*, 176 F.3d at 115 (finding the district court properly declined to order the government to grant immunity to a defense witness who, like a government witness, was involved in the murder); *United States v. Ebbers*, 458 F.3d 110,

118 (2d Cir. 2006) ("The government is under no general obligation to grant use immunity to witnesses the defense designates as potentially helpful to its cause but who will invoke the Fifth Amendment if not immunized.")   As the government stated, both Alicia Lee and Amanda Vizcarrondo-Ortiz testified at trial regarding their prostitution-related activities, and only Ms. Lee was immunized. (ECF No. 132, "Gov't Mem." at 24, n.6.)   Moreover, like Ms. Lee, the government offered Ms. Ruiz immunity for her prostitution-related activities, but not for her statements which, in the government's view, were false. (*Id.*)  Mr. Scott appears to argue that, despite the government's offer of limited immunity, the government's refusal to grant *blanket* immunity for Ms. Ruiz because she was likely to commit perjury at trial is "discriminatory." (ECF No. 134, "Def. Reply" at 2, n.1.)  Although Mr. Scott asserts that his requested grant of blanket immunity to Ms. Ruiz "would have left the government free to prosecute Ruiz for any trial perjury and . . . previous perjury," Mr. Scott's assertion is immediately belied by his further contention that Ms. Ruiz should be immune for any "testimony or evidence derived from her testimony." (*Id.*)  The Court finds this contradictory assertion to be untethered to any legal authority, and indeed, Mr. Scott cites none.

Additionally, where a witness – like Ms. Ruiz – repeatedly made conflicting statements during her few proffer sessions with

the government, and in Mr. Scott's 3500 disclosures, there are "legitimate law enforcement concerns" wrapped up in the government's decision to grant immunity. *Ebbers*, 458 F.3d at 118. The government may, for example, wish to disincentivize dishonest statements to a federal agent by prosecuting instead of immunizing the offender. *See United States v. Rodriguez*, 187 F. App'x 30, 34 (2d Cir. Jun. 12, 2006) (rejecting defendants' claim that the government should have granted immunity to a defense witness who made conflicting statements to government agents). Despite being represented by counsel, Ms. Ruiz made multiple assertions in direct conflict with record evidence, including that she did not know Mr. Scott. (Gov't Mem. at 23; ECF No. 113 at 2.)  Mr. Scott does not dispute that Ms. Ruiz's conflicting statements to federal agents could subject her to prosecution, and the Second Circuit has expressly counseled that "trial judges should summarily reject claims for defense witness immunity whenever the witness for whom immunity is sought is an actual or potential target of prosecution." *United States v. Turkish*, 623 F.2d 769, 778 (2d Cir. 1980).[2] Accordingly, the Court finds that Mr. Scott fails to meet his burden under the *Bahadar* factors.

---

[2] Although the Court need not reach the second or third *Bahadar* factors, the Court separately finds that Mr. Scott has also failed to meet his burden on those factors. First, even if Ms. Ruiz would have testified to being in a relationship with Mr. Scott – as defense counsel anticipated – that testimony is immaterial to whether Mr. Scott trafficked Ms. Ruiz. (*See* Def. Reply at 2-4.) Regardless of whether Ms. Ruiz perceived Mr. Scott as her "boyfriend," the overwhelming evidence admitted at trial proved that she was nevertheless forced,

Finally, the Court separately notes – as it did during trial – that Mr. Scott's application for immunity was untimely. As stated by the Second Circuit, a district court's finding of untimeliness is proper where "the demand for immunity was initially made in the middle of the trial[.]" *Turkish*, 623 F.2d at 777-78. Here, as in *Turkish*, Mr. Scott made his first application for blanket immunity on behalf of Ms. Ruiz after the close of the government's case. (Tr. 1305.) Mr. Scott was on notice of Ms. Ruiz's involvement in this case and had indicated his initial intention to call her as a witness as early as May 8, 2025 – *i.e.*, eleven days before the start of trial. (ECF No. 88.) Defense counsel further represented in his post-trial papers he had met with Ms. Ruiz on multiple occasions prior to trial to discuss her involvement in this case. (Def. Reply at 2-4.) Mr. Scott, however, waited until the close of the government's case before demanding that Ms. Ruiz be immunized. Accordingly, for this separate reason, Mr. Scott's application to compel the government

---

threatened, or coerced into performing commercial sex acts for her so-called "boyfriend." Indeed, throughout trial, the jury heard from multiple witnesses who trafficked, or were trafficked by, their romantic partner. (*See e.g.*, Tr. 657 (Mr. Simmons testifying to trafficking his girlfriend, Denise McPherson); Tr. 274 (Ms. Dymond testifying to being trafficked by her boyfriend, Cleveland Clay)).

Additionally, the Court finds that Mr. Scott fails to meet his burden of showing that Ms. Ruiz was the only source by which Mr. Scott could obtain this evidence. If, as Mr. Scott purports, Ms. Ruiz was not threatened, forced, coerced, or any combination thereof, into performing commercial sex acts, Mr. Scott has offered no reason why he could not have elicited those facts from other witnesses who worked closely with either Mr. Scott or Ms. Ruiz.

to grant blanket immunity to Ms. Ruiz was untimely, and properly denied.

Based on the trial record, and for the same reason that Mr. Scott's Rule 29 motion fails, the Court finds Mr. Scott has not demonstrated extraordinary circumstances or that a manifest injustice would result from allowing the guilty verdict to stand. Accordingly, Mr. Scott is not entitled to a new trial pursuant to Rule 33. *See United States v. Curry*, 542 F. Supp. 3d 197, 206-07 (W.D.N.Y. 2021) (denying defendant's Rule 33 motion for the same reasons that warranted denial of defendant's Rule 29 motion), *aff'd*, No. 22-50, 2023 WL 8073057 (2d Cir. Nov. 21, 2023).

<u>CONCLUSION</u>

For the foregoing reasons, the Court respectfully **DENIES** Mr. Scott's Rule 29 motion for a judgment of acquittal on all counts, and in the alternative, his Rule 33 motion for a new trial. All parties shall appear for Mr. Scott's sentencing on January 22, 2026 at 11:00 a.m. in Courtroom 6B South.

**So ordered.**

Dated:    October 27, 2025
          Brooklyn, New York

_____
**Hon. Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York